UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

MANDI GRIFFIN, also known as MANDI T. GRIFFIN,

                                  Petitioner,

                                              9:14-CV-00024

v.

                                              (DNH/TWD)

SABINA KAPLAN,

                                  Respondent.
_____

APPEARANCES:                        OF COUNSEL:

MANDY GRIFFIN
06-G-0281
Petitioner pro se
Bedford Hills Correctional Facility
247 Harris Road
Bedford Hills, New York 10507

HON. ERIC T. SCHNEIDERMAN
Attorney General for the State of New York     LISA E. FLEISCHMANN, ESQ.
Counsel for Respondent                  Assistant Attorney General
120 Broadway
New York, New York 10271


**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## REPORT-RECOMMENDATION

## I.    INTRODUCTION

This matter has been referred to this Court for Report and Recommendation, pursuant to

28 U.S.C. § 636(b) and Northern District Local Rule 72.3(c), by the Hon. David N. Hurd,

United States District Judge.  Presently before this Court is the amended petition of Petitioner

Mandi Griffin, an inmate in the Bedford Hills Correctional Facility ("Bedford Hills"), for a writ

of habeas corpus under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28

U.S.C. § 2254. (Dkt. No. 7.)

Petitioner is challenging a judgment of conviction entered on March 13, 2006, after a jury trial in Jefferson County Court. On December 13, 2005, Petitioner was convicted, upon a jury verdict, of murder in the second degree (N.Y. Penal Law § 125.25(4)), manslaughter in the first degree (N.Y. Penal Law §125.20(4)); assault in the second degree (N.Y. Penal Law § 120.05(9)); and endangering the welfare of a child (N.Y. Penal Law § 260.10(1)). (Dkt. Nos. 15 at 91; 15-5 at 16.[1]) On March 13, 2006, Petitioner was given an indeterminate sentence of twenty-two years to life on the murder conviction; a determinate sentence of twenty-two years with five years post release supervision on the manslaughter conviction; a determinate sentence of seven years on the assault conviction; and a determinate sentence of one year on the child endangerment charge. *Id*. at 92. The sentences were ordered to run concurrently. *Id*.

The Appellate Division, Fourth Department modified the judgment on Petitioner's direct appeal by reversing and dismissing the second-degree assault conviction, and otherwise affirmed the County Court judgment, *People v. Griffin*, 851 N.Y.S.2d 808 (4th Dept. 2008), and the Court of Appeals denied leave to appeal. *People v. Griffin*, 859 N.Y.S.2d 399 (Table) (2008).

For reasons explained below, the Court recommends that the amended petition be denied and dismissed as time-barred under the AEDPA, 28 U.S.C. § 2244(d)(1).

## II.    TRIAL

### A.    February 23, 2005 Events at the Griffin Home

Petitioner and her husband Daryl Griffin, a Private First Class in the United States Army,

---

[1] Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

were the parents of three year old twins, Vanessa and her brother. (Dkt. No. 14-4 at 964-65.)

Vanessa, who had cerebral palsy, was unable to speak or walk, although she could make noises

and scoot on her back using her feet. *Id*. at 6-7. Vanessa had to be fed through a gastronomy

tube leading into her stomach, and the tube occasionally became dislodged. *Id*. at 8, 17-18. On

February 22, 2005, a school psychologist administered developmental assessment tests to

Vanessa which showed Vanessa to be non-verbal, although able to keep good eye contact. (Dkt.

Nos. 14-3 at 148, 156-158; 15-1 at 21-24.) Vanessa was unable to move, sit, or stand

independently. *Id*. at 160-61. Vanessa's development was found to be the equivalent of an

eight month old. *Id*. at 163.

 According to a statement Petitioner gave to State Police Investigator Colleen O'Neill on

February 24, 2005, which was read into evidence at trial, Petitioner spent most days taking care

of the twins while her husband was at work. (Dkt. Nos. 14-3 at 267; 15-2 at 69.) On February

23, 2005, Vanessa was sitting in her stroller in the kitchen fussing and screaming as she did

most of the time. (Dkt. No. 15-2 at 69.) Petitioner unhooked the buckle on Vanessa's lap, and

she started to try to slide out of the stroller. *Id*. Petitioner became frustrated and grabbed

Vanessa, carried her to the couch in the livingroom, slammed her and threw her on the couch

four or five times. *Id*. Vanessa hit her head on the wooden arm rest and upper part of the side of

the couch, and Petitioner could tell that Vanessa's head hit the wooden part of the couch

because she could hear the sound of her head hitting the wood. *Id*.

 Petitioner left Vanessa on the couch and went to her room to lie down for fifteen or

twenty minutes, with Vanessa crying the whole time. *Id*. at 70. When Petitioner went back into

the livingroom, she put Vanessa in her bed, lying her on her stomach so she would not fiddle

with her feeding tube. *Id*. Petitioner saw a red mark on Vanessa's forehead. *Id*. Petitioner left Vanessa to cry herself to sleep, and an hour and a half later when she checked on Vanessa, Petitioner saw a bruise on Vanessa's head and put a piece of ice in a cloth on her head. *Id*. Petitioner left the cloth on Vanessa's head after the ice melted. *Id*.

Vanessa's father Daryl testified at trial that he came home from work at between 5:40 and 5:50 in the afternoon on February 23rd. (Dkt. No. 14-4 at 9.) Vanessa was in her room, and he fed her through the feeding tube about five minutes after he got home. *Id*. at 10-11, 20. Daryl saw that Vanessa had a towel on her forehead and left it there. *Id*. at 12. When he went back in to check on Vanessa later that evening, she was still breathing. *Id*. at 21-22.

According to Petitioner's statement, she and her husband watched television in their room, and at around 11:30 or midnight she heard Vanessa snoring and had a feeling something was wrong with her. (Dkt. No. 15-2 at 70.) When Petitioner checked on Vanessa, her chin was down, and she was having trouble breathing. *Id*. Daryl testified that he shook Vanessa a bit, and she looked at him and began making a cooing noise. (Dkt. No. 14-4 at 23.) Daryl went back to sleep and was awakened by Petitioner who was concerned about Vanessa's breathing. *Id*. at 23. Daryl performed CPR. *Id*. at 24. After first extracting some milk from Vanessa's stomach and concluding it did not help, Darryl called 911, and they attempted resuscitation while waiting for the ambulance. *Id*. at 25; Dkt. No. 15-2 at 70. In her statement, Petitioner wrote that she had acted out of frustration because she did not have enough help, and that she lost her temper about every two weeks but did not want to hurt her daughter. (Dkt. No. 15-2 at 70.)

Investigator O'Neill testified at trial that subsequent to making her original statement,

Petitioner spoke with her again to discuss why Vanessa's body temperature when she arrived at the hospital was significantly lower than would have been expected had Vanessa died at 11:00pm or midnight as Petitioner had indicated in her statement. (Dkt. No. 14-3 at 273.) Petitioner told O'Neill that when she went to check on Vanessa after putting her in her bed, Vanessa was hot so Petitioner put her in a tub of cold water where she was almost unresponsive, and then wrapped her in a towel and put her back in bed. *Id*. at 275. Petitioner left Vanessa in bed and went to the living room to exercise. *Id*. When her husband came home and was feeding Vanessa, Petitioner took a bath. *Id*. According to Petitioner, her husband had told her that Vanessa did not wake up when he fed her. *Id*. Petitioner then told O'Neill that she knew that Vanessa was dead. *Id*. Petitioner and her husband then watched television and at around 11:00 or 11:30 pm brought Vanessa into bed with them. *Id*. at 276. Petitioner pretended that Vanessa was alive for her husband's sake and because she was not ready to say good-bye to her daughter. *Id*.

### B.     Emergency Response and Resuscitation Efforts

The State Troopers who responded to the 911 call attempted to resuscitate Vanessa for ten minutes until the ambulance arrived and continued on the way to the hospital. (Dkt. No. 15-1 at 32.) Dr. Nancy Sanderson, who worked in the emergency room at the Carthage Area Hospital and had seen Vanessa on February 13, 2005, when her feeding tube had become dislodged, was on duty when Vanessa was brought in shortly after midnight on February 24, 2005. (Dkt. No. 14-3 at 60-61, 65-66, 70-71.) Vanessa was completely unresponsive and cold. *Id*. at 71. Her pupils were fixed and dilated, and she had no respirations, no responsiveness at all, and no cardiac activity. *Id*. After an unsuccessful one and a half hour attempt to resuscitate

Vanessa, Dr. Sanderson called the code. *Id*. at 71-72. Dr. Sanderson testified that she was certain Vanessa was dead when she arrived at the emergency room and was fairly certain she had died before the EMS began working on her. *Id*. at 76. Dr. Sanderson's statement to the police indicated that Vanessa's body temperature when she arrived at the hospital was 88.7. *Id*. at 91. Dr. Sanderson could tell that Vanessa had been badly beaten. *Id*. at 77. Vanessa had bruises all over her face, bruises on her leg, her head, and her eye. *Id*.

### C. Autopsy

An autopsy was performed by pathologist Samuel Livingstone, M.D. (Dkt. No. 14-4 at 124.) Dr. Livingstone observed a number of bruises on Vanessa's body, including one an inch and a half to two inches on her forehead. *Id*. at 127-28. There were other bruises on her head and small contusions. *Id*. at 128. Dr. Livingstone found major injuries on Vanessa's head but could not find any objects in the evidence that would match the pattern of the injuries. *Id*. at 128. Upon examination of Vanessa's scalp, Dr. Livingstone found a number of subgaleal hemorrhages, including one near the forehead and one immediately above the left ear, each of which appeared to be caused by a single blow. *Id*. at 137. There was a large cluster of hemorrhages to the left of the midline and extending almost to the left ear. *Id*. All of the contusions and subgaleal hemorrhages were on the left side of Vanessa's head between the midline to the left ear. *Id*. at 144. Dr. Livingstone found the same pattern of injuries on Vanessa's scalp. *Id*. at 138. There was no skull fracture. *Id*. at 190.

When Dr. Livingstone began peeling Vanessa's skull cap, he noticed a large amount of free blood, a large amount of blood that had clotted within the subdural space, and smaller amount of blood in the arachnoid membrane. *Id*. at 140. According to Dr. Livingstone, one

would generally find in the order of a teaspoon of blood when the skull cap is removed, but in this case there was a bit over half a cup. *Id*. Dr. Livingstone testified that much blood would cause circulation problems for the brain in that as the pressure goes up, the blood flow slows and eventually stops, at which point Vanessa would have died from lack of blood flow. *Id*. The bleeding was primarily around Vanessa's brain stem between the brain and inner surface of the skull with no bleeding within the brain tissue. *Id*. at 196.

Dr. Livingstone did not believe cerebral palsy or a seizure disorder caused Vanessa's death. *Id*. at 142. He opined within a reasonable degree of medical certainty that her death was caused by subdural hematoma due to blunt force trauma, and in his Amended Autopsy Report concluded that the manner of death was homicide. *Id.* at 142-43; *see also* Dkt. No. 15-4 at 178-84. Dr. Livingstone explained that when one is struck in the head, there is a good chance some of the very small blood vessels from the skull to the dura or from the arachnoid membrane to the brain are going to be sheared off. *Id*. at 143. Since they are small vessels it usually takes some time for death to occur. *Id*  Dr. Livingstone opined that Vanessa appeared to have been struck maybe four, five, or eight times on the left side of the head, which was enough to disrupt the membranes within the skull and permit the bleeding to occur. *Id*. He testified that there were separate injuries over the left side of the skull, including one large area where a number of blows hit, and the blows were overlapping. *Id.* at 144. Dr. Livingstone opined that Vanessa's injuries were consistent with impact blows of several hundred, if not several thousand, G forces produced because of the sudden stop, and that being picked up and slammed five times into the wooden portion of the couch or the wooden chairs hard enough that one could hear her head connecting with the wood would be consistent with the cause of death. *Id*. at 159.

There was a large blood clot from the base of Vanessa's brain that according to Dr. Livingstone would have taken some time to form, indicating that Vanessa did not die instantly. *Id.* at 153. He made an educated guess that Vanessa had probably died five hours before she arrived at the emergency room, which would have been around 7:00pm, give or take a couple of hours. *Id.* at 155, 177. Dr. Livingstone testified that Vanessa might or might not have been dead at the time she was fed. *Id.* at 160.

## III. STATE COURT POST-VERDICT PROCEEDINGS

### A. Motion to Set Aside the Verdict

Following the verdict against her, Petitioner moved by new counsel to set aside the verdict pursuant to New York Criminal Procedure Law ("CPL") § 330.30 on the grounds of inadequate assistance of counsel at trial. (Dkt. No. 15-3 at 133.) In her affidavit in support of the motion, Petitioner claimed that while she was being questioned on February 24, 2005, she was extremely distraught, had not slept or eaten, and was questioned continuously until she became compliant with the theory of her interrogators regarding Vanessa's death and was pressured by State Police into filing an untrue statement. *Id.* at 134. Petitioner denied injuring or killing Vanessa. *Id.* Petitioner argued on the motion that she believed Vanessa may have had a subdural hematoma caused either by the use of forceps at birth or a seizure or seizures after birth. *Id.* at 136. Petitioner claimed that her trial counsel had not provided adequate representation because, among other things, no one had reviewed Vanessa's birth records to see if there were unresolved issues from her birth, such as a persisting subdural hematoma, and she had not brought in witnesses from California where Vanessa was born to testify on Petitioner's behalf. *Id.* at 137-38.

Petitioner's counsel submitted an affirmation asserting that the caseload of the Jefferson County Public Defender exceeded generally accepted standards, and that the Public Defender assigned to Petitioner's case was simultaneously assigned to another murder case. *Id*. at 142-43. Counsel also opined that Vanessa's medical history was not fully explored at trial and articulated a belief on his part that it was possible and likely that Vanessa suffered brain trauma at birth. *Id*. at 143. The People opposed the motion, and it was denied prior to sentencing at least in part because a number of the issues raised were properly raised in a motion under CPL § 440.10. (Dkt. Nos. 14-5 at 184; 15-3 at 165-67.)

### B.     Direct Appeal

Petitioner appealed to the Appellate Division, Fourth Department from the judgment of conviction on or about March 13, 2006. (Dkt. No. 15 at 89.) On appeal, Petitioner argued that: (1) the depraved indifference murder and first degree manslaughter convictions were inconsistent; (2) the People failed to prove depraved indifference; (3) the evidence that Petitioner acted recklessly was legally insufficient for convictions of murder in the second degree and manslaughter in the first degree; (4) the People failed to submit evidence of Petitioner's age, which was an element of the manslaughter and assault charges; (5) assault is a lesser included offense of manslaughter in the first degree thus requiring that the assault conviction be vacated; (6) the court unfairly prejudiced Petitioner by instructing the jury that manslaughter in the second degree and criminally negligent homicide were lesser included offenses and by submitting the murder and manslaughter charges conjunctively; (7) Petitioner's post-verdict motion should not have been summarily denied; and (8) the harsh and excessive sentence was imposed improperly to penalize Petitioner for exercising her right to a jury trial.

9

*Id*. at 4-5.

The Appellate Division unanimously modified the judgment of conviction by reversing that part convicting Petitioner of assault in the second degree, dismissing count three of the indictment, and affirming the judgment as modified. *People v. Griffin*, 851 N.Y.S.2d 808, 812 (4th Dept. 2008). The Court rejected Petitioner's challenge to the sufficiency of the evidence on the depraved indifference conviction, finding that the evidence which included Petitioner's confession that: (1) she slammed and threw Vanessa on the couch four or five times causing her to strike her head on the wooden armrest and upper portion of the couch, which was found to have caused her to sustain injuries that were likened by the medical examiner to those caused by a fall "from a second story stairway"; and (2) she then left Vanessa alone face-down on her bed while she exercised in the living room and took a two hour bath, rather than seeking immediate medical help because "she could not deal with it then." *Id*. at 811. The Court also rejected Petitioner's contention that the County Court had erred in denying her CPL § 330.30 motion seeking to vacate the judgment of conviction without a hearing on the grounds that it concerned matters outside the record on appeal and was properly the subject of a motion pursuant to CPL § 440.10. *Id*. at 811-12. The Court found that Petitioner's counsel was not ineffective for bringing the motion under § 330.30 because it did not foreclose moving under § 440.10. *Id*.

The Court found that Petitioner had failed to preserve her claims: (1) with regard to proof of her age, but nevertheless found it meritless, *id*. at 811; (2) with regard to her contention that she had been prejudiced by the jury instructions characterizing second-degree manslaughter and criminally negligent homicide as lesser included offenses, and submitting the manslaughter and murder counts to the jury in the conjunctive, and declined to review it in the interest of justice,

*id.*; (3) that the murder and manslaughter claims were inconsistent, and declined to review it in the interests of justice, *id.* at 810; and (4) that the County Court had penalized her by imposing a harsher sentence than that proposed in a plea offer because she exercised her right to a trial, but nevertheless found it meritless. *Id.* at 812.

Petitioner raised all of the issues raised in the Appellate Division in her unsuccessful application for leave to appeal to the Court of Appeals. (Dkt. No. 15-4 at 90-109, 111.)

### C. Motion Under CPL § 440.10

On April 22, 2009, Petitioner moved pro se (with a counsel drafted affirmation in support) to vacate the judgment of conviction under CPL § 440.10. (Dkt. Nos. 15-4 at 112-13; 15-5 at 18-19.) The initial grounds raised by Petitioner were: (1) she could not be convicted of acting recklessly (depraved indifference murder) and intentionally (manslaughter), and submission of both counts confused the jury, as did the court's statement that second degree manslaughter and criminally negligent homicide were lesser included offenses, *id.* at 122; (2) her trial counsel was ineffective for failing to present the testimony of a pathologist and medical expert in her defense, *id.* at 123; (3) the court violated her rights by imposing a harsh sentence because she had exercised her right to take her case to trial, *id.* at 123-24; (4) no *Wade* hearing was held to verify her identification and age at the time of her arrest and trial, *id.* at 124; (5) her confessions were involuntary, *id.*; and (6) she did not have a jury of her peers because no one of color was present. *Id.* at 125.

Petitioner submitted a supplemental affidavit adding numerous other grounds, including: (7) Petitioner was prejudiced by media coverage, including a statement by the prosecutor that Petitioner had no remorse, *id.* at 152; (8) the court erred in denying a change of venue, *id.* at

153; (9) Petitioner was entitled to a hearing regarding the time of Vanessa's death and whether the emergency measure taken were appropriate for a child with cerebral palsy, *id*. at 153-54; (10) Petitioner was not allowed to have her own autopsy performed, *id*. at 154; (11) the People's expert witness and evidence outweighed the defense's, *id*. at 154; (12) Petitioner was not given a copy of the People's expert's written reports, *id*. at 154-55; (13) at mid-trial, Petitioner's attorney was told off-the-record that Petitioner could plead guilty to criminally negligent homicide for a five-year prison sentence. *id* at 155; (14) Petitioner's confessions were involuntary, *id*.; (15) aspects of Misty Wekar's testimony were improper, *id*. at 155-57; (16) Petitioner's *actus rea* and *mens rea* were not clearly defined in her written statements to investigators, *id* at 157; (17) supplementation of the autopsy report was not brought to the County Court's attention, *id*.; (18) the County Court erred in denying Petitioner's § 330.30 motion; and (19) the verdict sheet improperly included manslaughter in the second degree and criminally negligent homicide.  *Id*. at 158.

On October 1, 2012, the Hon. Kim Martusewicz, Jefferson County Court, denied Petitioner's § 440.10 motion in its entirety.  (Dkt. No. 15-5 at 77-86.)  In her Decision-Order, Judge Martusewicz addressed Petitioner's argument that her trial counsel had been ineffective in failing to explore the possibility that Vanessa's injuries and death were related to her pre-existing medical condition, and for failing to present evidence from Petitioner's pathologist to refute the testimony of the pathologist called by the People.[2]  (Dkt. No. 15-5 at 80-81.)  The Judge noted that the defense was granted permission to hire a pathologist with public funds, and

---

[2]  Petitioner included the affidavit she had filed on her § 330.30 motion, containing the argument that Vanessa's injuries may have been related to her pre-existing medical condition, as a part of her § 440.10 motion.  (Dkt. Nos. 15-4 at 187; 15-5 at 3-15.)

the fact that defense counsel did not call its pathology expert as a witness raised the strong possibility that the expert did not find a plausible medical explanation for the child's injuries or death. *Id*. at 80. Judge Martusewicz further found that there was "no reasonable possibility that the child's death or injuries were the result of the child's pre-existing medical condition," and concluded that defense counsel was not ineffective for failing to call a pathologist to testify on Petitioner's behalf. *Id.* at 81.

Petitioner sought leave to appeal to the Appellate Division from the denial of her § 440.10 motion on or about December 31, 2012. (Dkt. No. 15-5 at 1118-24.) The Appellate Division denied leave to appeal on May 23, 2013. (Dkt. No. 15-6 at 134.)

## IV. Petitioner's Habeas Proceedings

### A. Initial Proceeding

Petitioner commenced her first habeas corpus proceeding on September 4, 2009, while her § 440.10 motion was pending in state court. (No. 9:09-CV-01004 (N.D.N.Y.), Dkt. No. 1.) On February 8, 2010, Petitioner filed a letter motion requesting a stay of the proceeding until her state remedies were exhausted. *Id*., Dkt. No. 9. In a Decision and Order filed on February 9, 2010, the Hon. Thomas J. McAvoy, Senior United States District Judge, citing *Rhines v. Weber*, 544 U.S. 269, 276 (2005), denied the motion for a stay on the grounds that Petitioner had failed to show good cause for her failure to fully exhaust before commencing the habeas proceeding. *Id*., Dkt. No. 11 at 2-4. The ordering language directed that if Petitioner wanted to dismiss the petition without prejudice to enable her to exhaust her state remedies, she must do so within twenty days. *Id*. at 4. Petitioner submitted a letter motion, filed on March 1, 2010, seeking dismissal of the proceeding without prejudice to allow her to pursue her § 440.10 motion, as

13

well as other state remedies.  (No. 9:09-CV-01004 (N.D.N.Y.), Dkt. No. 12.)  Judge McAvoy

granted the motion in an Order filed on March 9, 2010, in which he advised Petitioner "to

*promptly* file a new § 2254 petition in this District after she has fully exhausted all state court

challenges relating to her Jefferson County conviction if, at that time, she seeks federal habeas

relief relating to such conviction."  (No. 9:09-CV-01004 (N.D.N.Y.), Dkt. No. 15 at 2.)

###    B.    Present Proceeding

Petitioner's original petition in this habeas proceeding is dated December 31, 2013, and

was filed on January 8, 2014.  (Dkt. No. 1.)  An amended petition was filed by Petitioner on

March 17, 2014.  (Dkt. No. 7.)  The grounds for relief asserted by Petitioner are: (1) ineffective

assistance by trial counsel who failed to investigate, failed to object during trial, failed to

produce evidence that may have helped her case, and failed to challenge the medical evidence;

(2) ineffective assistance by post-conviction attorney who failed to maintain the judge's order,

and failed to inform Petitioner of her appeal rights; (3) coerced confession; (4) failure to honor

Petitioner's request for counsel in violation of her Miranda rights; (5) damaging daily media

coverage; and (6) failure to have any person of color on the jury.  *Id*. at 4-5.

Respondent filed an answer to the amended petition and memorandum of law in

opposition, which includes, *inter alia*, an argument for dismissal of the amended petition as

time-barred under the AEDPA.  (Dkt. Nos 13 and 13-1.)  Petitioner filed a traverse.  (Dkt. No.

24.)

## V. ANALYSIS OF THE TIMELINESS OF PETITIONER'S HABEAS PROCEEDING UNDER THE AEDPA

### A. Statute of Limitations Under the AEDPA

Under the AEDPA, a petitioner must file an application for a writ of habeas corpus within one year of her or his conviction becoming final. 28 U.S.C. § 2244(d)(1). A conviction becomes final for AEDPA purposes "when [the] time to seek direct review in the United States Supreme Court by writ of certiorari expire[s]," that is ninety days after the final determination by the state court. *Williams v. Artuz,* 237 F.3d 147, 150 (2d Cir. 2001) (citation and internal quotation marks omitted). The statute of limitations may be tolled when a "properly filed application for state post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." 28 U.S.C. § 2244(d)(2); *see also Fernandez v. Artuz*, 402 F.3d 111, 116 (2d Cir. 2005). However, a post-conviction challenge does "not reset the date from which the one-year statute of limitations begins to run." *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000) ("If the one-year period began anew when the state court denied collateral relief, then state prisoners could extend or manipulate the deadline for federal habeas review by filing additional petitions in state court.") The statute of limitations begins to run again from the date on which the state court issues a final order and no further appellate review is available. *See, e.g.*, *Saunders v. Senkowski*, 587 F.3d 543, 549 (2d Cir. 2009). "A state-court collateral attack on a conviction cannot toll an already expired limitations period." *Bell v. Herbert*, 476 F.Supp. 2d 235, 244 (W.D.N.Y. 2007) (citing *Smith*, 208 F.3d at 13, 17.) Furthermore, the filing of a petition for habeas corpus in federal court does not toll the statute of limitations, *Rhines*, 544

U.S. at 274-75, so Petitioner's initial habeas proceeding has no impact on whether this proceeding is time-barred.

## B.     Timeliness of Petitioner's Present Habeas Proceeding

On April 21, 2008, the Court of Appeals denied Petitioner's application for leave to appeal from the Appellate Division, Fourth Department order on the direct appeal of the Jefferson County judgment of conviction. *See People v. Griffin*, 859 N.Y.S.2d 399 (Table) (2008). Because Petitioner did not file a petition for a writ of certiorari in the United States Supreme Court, (Dkt. No. 7 at 2), her conviction became final ninety days later on July 21, 2008. *Williams*, 237 F.3d at 150. Absent any tolling of the statute of limitations, Petitioner's last day to file a timely habeas petition was July 21, 2009.

Petitioner made her § 440.10 motion on April 22, 2009. (Dkt. No. 15 at 112-12.) The statute of limitations, which commenced running on July 21, 2008, had run for 275 days at the time it was tolled by the § 440.10 motion. After Judge Martusewicz denied Petitioner's motion, Petitioner filed a motion pursuant to CPL § 460.20 for leave to appeal the denial of her § 440.10 motion (Dkt. No. 15-5 at 89), and the tolling period continued until the Appellate Division denied Petitioner's application for leave to appeal on May 23, 2013. (Dkt. No. 15-6 at 134.) Petitioner's original petition in this habeas proceeding, dated December 31, 2013, was mailed to the Clerk from Bedford Hills on January 6, 2014.[3] (Dkt. No. 1 at 19.)

_____

[3] Under the "mailbox rule," because of the unique difficulties faced by incarcerated pro se litigants, an inmate's pleading is deemed to be properly filed at the time she or he hands it over to the prison authorities for transmittal to the court. *See Dory v. Ryan*, 999 F.2d 679, 681-82 (2d Cir. 1993), *modified on reh'g*, 25 F.3d 81 (2d Cir. 1994) (citing *Houston v. Lack*, 487 U.S. 266, 270 (1988). The record, while revealing the January 6, 2014, date on the envelope in which the petition was sent to the Clerk, does not reflect the date on which the petition was handed to prison officials. However, because the petition is dated December 31, 2013, the

16

When the tolling period ended on May 23, 2013, Petitioner had ninety days remaining on the one-year statute of limitations. *See McGinnis*, 208 F.3d at 17. Therefore, August 21, 2013, was the last day upon which Petitioner could have filed a timely habeas petition. Even if the Court were to deem December 31, 2013, the date on which the petition was signed by Petitioner, as the filing date, the petition would have been filed 132 days after the expiration of the one-year statute of limitations. Therefore, the Court finds that Petitioner's habeas proceeding is time-barred. Furthermore, for reasons discussed below, the Court finds that Petitioner has failed to provide grounds for the equitable tolling of the statute of limitations or an equitable exception.

## VI. ANALYSIS OF PETITIONER'S CLAIMS FOR EQUITABLE TOLLING AND EQUITABLE EXCEPTION

### A. Equitable Tolling

#### 1. Legal Standard

The AEDPA statute of limitations is not jurisdictional and is subject to equitable tolling in appropriate cases. *Holland v. Florida*, 560 U.S. 631, 645 (2010); *Smith*, 208 F.3d at 17 (equitable tolling applies only in "rare and exceptional circumstances" (citation omitted)). The Supreme Court has made it clear that "a petitioner is entitled to equitable tolling only if [she or] he shows (1) that [she or] he has been pursuing [her or] his rights diligently, and (2) that some extraordinary circumstance stood in [her or] his way and prevented timely filing." *Holland*, 560 U.S. at 649 (citation and internal quotation marks omitted); *see also Smith*, 208 F.3d at 17 (the one year AEDPA statute of limitations may be equitably tolled in "extraordinary or exceptional circumstances" where the party seeking equitable tolling has "acted with reasonable diligence

---

Court will assume that it was given to prison authorities no earlier than December 31, 2013, and no later than January 6, 2014. (Dkt. No. 1 at 6.)

during the period he seeks to toll"); *Muller v. Greiner*, 139 F. App'x 344, 345 (2d Cir. 2005) (the petitioner bears the burden of affirmatively showing that equitable tolling is appropriate). The standard for evaluating a claim of extraordinary circumstances is one that focuses not on the "uniqueness of a party's circumstances," but instead on "the severity of the obstacle impeding compliance with the limitations period." *Harper v. Ecole*, 648 F.3d 132, 137 (2d Cir. 2011).

A petitioner seeking to toll the statute of limitations must not only show that extraordinary circumstances prevented her or him from filing a petition, and that she or he acted with due diligence throughout the period sought to be tolled, she or he must "demonstrate a causal connection relationship between the extraordinary circumstances on which the claim for equitable tolling rests and the lateness of the filing, a demonstration that cannot be made if the petitioner, acting with reasonable diligence, could have filed on time notwithstanding the extraordinary circumstances." *Valverde v. Stinson*, 224 F.3d 129, 134 (2d Cir. 2000). Where extraordinary circumstances prevented the petitioner from filing her or his petition "for some length of time," the federal habeas court must still determine whether they "prevented [her or] him from filing [her or] his petition *on time*." *Id.* (emphasis in original; citation and internal quotation marks omitted).

"[W]hether equitable tolling is warranted in a given situation is a highly case-specific inquiry." *Bolarinwa v. Williams*, 593 F.3d 226, 232 (2d Cir. 2010) (citation and internal quotation marks omitted). "To establish extraordinary circumstances, a petitioner must support [her or] his allegations with evidence; [she or] he cannot rely solely on personal conclusions or assessments." *Collins v. Artus*, 496 F.Supp. 2d 305, 313 (S.D.N.Y. 2007). Further, a petitioner must show that she or he "was unable to pursue [her or] his legal rights during the entire period

that [she or] he seeks to toll." *Id.*

      2.    <u>Analysis of Petitioner's Claim</u>

In her traverse, Petitioner references the term "equitable tolling" a number of times. (See Dkt. No. 24 at 4-7.) However, her use of the term has nothing to do with any reason there may have been for the untimeliness of this habeas proceeding, but rather the merits of the grounds for habeas relief asserted by her. Petitioner has made no claim that "some extraordinary circumstance stood in [her] way and prevented a timely filing." *Holland*, 560 U.S. at 649. She has made no claim in her traverse that she was unable to pursue her legal rights from the time the tolling period ended on May 23, 2013, and August 21, 2013, the final day of the limitations period. (*See* Dkt. No. 24 at 4-7.) Petitioner claims only that if her filing was untimely, the untimeliness should be overlooked because of the meritorious nature of the grounds upon which she is seeking relief. *Id.*

When Judge McAvoy granted Petitioner's request for dismissal without prejudice of her original habeas proceeding, he specifically cautioned her to file another habeas proceeding promptly after she had exhausted her state court remedies. (No. 9:09-CV-01004 (N.D.N.Y.), Dkt. No. 15 at 2.) Petitioner failed to do so without providing any excuse. Therefore, the Court finds that Petitioner has presented no basis for equitable tolling of the statute of limitations.

    **B.**    **Equitable Exception**

      1.    <u>Legal Standard</u>

In *McQuiggin v. Perkins*, ___ U.S. ___, 133 S.Ct. 1924, 1931-36 (2013) the Supreme Court held that a credible showing of "actual innocence" under the standard announced in *Schlup v. Delo*, 513 U.S. 298, 329 (1995) could serve as a gateway for gaining review of an

otherwise time-barred habeas petition. A year earlier, in *Rivas v. Fischer*, 687 F.3d 514, 530-43 (2d Cir. 2012), the Second Circuit had concluded that a petitioner who can demonstrate "actual innocence" may be excused from the AEDPA one-year statute of limitations period. Actual innocence serves only as a gateway to federal habeas review by allowing an otherwise untimely petition to be reviewed on the merits. *McQuiggin*, 133 S.Ct. at 1928.

In *Rivas*, the Second Circuit distinguished a plea to override the AEDPA limitations period based upon actual innocence from a request for equitable tolling, finding the actual innocence issue to be more accurately described as whether an "equitable exception" to § 2244(d)(1) exists in such cases. 687 F.3d at 547, n.42. The Supreme Court, citing *Rivas*, adopted the term "equitable exception" in *McQuiggin*. 133 S.Ct. at 1931.

"To invoke the miscarriage of justice exception to AEDPA's statute of limitations, . . . a petitioner 'must show that it is more likely than not that no reasonable juror would have convicted him in the light of new evidence.'" *McQuiggin*, 133 S.Ct. at 1935 (quoting *Schlup*, 513 U.S. at 327). The claim of innocence must be both "credible" and "compelling." *Rivas*, 687 F.3d at 541 (citing *House v. Bell*, 547 U.S. 518, 521, 538 (2006)). In order for a claim to be found credible, it must be supported by "new reliable evidence     whether it is exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence    that was not presented at trial." *Schlup*, 513 U.S. at 324; *accord Rivas*, 687 F.3d at 541, 543 ("new evidence" is evidence not presented at trial). A claim of innocence is compelling if the petitioner proves that it is more likely than not that "any reasonable juror would have a reasonable doubt." *House*, 547 U.S. at 538; *accord Rivas*, 687 F.3d at 541. When a Petitioner presents new evidence, "the habeas court must determine whether the new evidence is

trustworthy by considering it both on its own merits and, where appropriate, in light of the pre-existing evidence in the record." *Doe v. Menefee*, 391 F.3d 147, 161 (2d Cir. 2004) (quoting *Schlup*, 513 U.S. at 327-28).

2.    Analysis of Petitioner's Claim

Petitioner has cited *McQuiggin* in her traverse, but her traverse does not reveal a clear understanding on her part that for the equitable exception articulated in *McQuiggin* to apply, the "actual innocence" claim that serves as a gateway to review of time-barred claims must be supported by "new reliable evidence    whether it is exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence    that was not presented at trial." *Schlup*, 513 U.S. at 324.  In her traverse, Petitioner argues for an equitable exception, not based upon new evidence showing actual innocence, but rather on the grounds that her signed statements were made under duress; her *Miranda* rights were violated; there was no evidence at trial regarding depositions by her husband; there was no hearing regarding the fact that there were two autopsies; evidence was admitted at trial regarding the finding of an unidentified clump of hair at Petitioner's home for the purpose of suggesting that Petitioner had pulled out her daughter's hair; unidentified evidence presented by the Assistant Attorney General was not presented at trial, requiring an evidentiary hearing to determine if evidence was suppressed or there was evidence tampering; a request for exhumation of Vanessa's body in a motion for reconsideration in state court is not part of the state court record; the state court record was underdeveloped with flagrant errors in the state court proceedings; and determinations were made based on an unreasonable application of federal law.  (Dkt. No. 24 at 2-6.)

Petitioner has argued ineffective assistance of counsel on the grounds that counsel did

21

not obtain the medical records from Vanessa's birth to ascertain whether she may have had a subdural hematoma or seizure disorder that contributed to her death; failed to present the testimony of a pathologist and medical expert in her defense; and failed to challenge the medical evidence at trial. (Dkt. No. 7 at 4; *see also* Dkt. Nos. 15-3 at 136-38;15-4 at 123.) However, Petitioner has not submitted any new evidence that supports even a possibility that Vanessa's death was caused by a subdural hematoma present at birth or a seizure, let alone reliable evidence that would more likely than not leave any juror with reasonable doubt as to Petitioner's guilt. *Rivas*, 687 F.3d at 541. In sum, Petitioner's claim of actual innocence, unsupported by any evidence, is neither "credible" nor "compelling," *id.*, and the Court finds that Petitioner is not entitled to an equitable exception from the bar presented by the expired statute of limitations.

## VII.   CONCLUSION

The Court has found that Petitioner's habeas proceeding is time-barred under the one-year statute of limitations in the AEDPA. The Court has further found that Petitioner has failed to show that the statute of limitations should be equitably tolled or that there is support for an equitable exception. Therefore, the Court recommends that Petitioner's amended petition for a writ of habeas corpus (Dkt. No. 7) be denied and dismissed in all respects on the grounds that it is time-barred, and having made that recommendation, the Court finds it unnecessary to consider the grounds for habeas relief set forth in Petitioner's amended petition.

**WHEREFORE**, it is hereby

**RECOMMENDED**, that the amended petition for a writ of habeas corpus (Dkt. No. 7) be **DENIED** and **DISMISSED** in all respects on the grounds that it is time-barred; and it is

further

**RECOMMENDED** that a certificate of appealability not issue with respect to any of the claims set forth in the petition.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report.[4]  Such objections shall be filed with the Clerk of the Court.  **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW</u>**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health & Human Servs.,* 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated:  January 27, 2017
      Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge

---

[4]  If you are proceeding pro se and are served with this Report-Recommendation by mail, three additional days will be added to the fourteen day period, meaning that you have seventeen days from the date the Report-Recommendation was mailed to you to serve and file objections. Fed.R.Civ.P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed.R.Civ.P. 6(a)(1)(C).